PIERSON (BANK OF WASHINGTON v.).
See Case No. 953.

## Case No. 11,156.
### PIERSON v. EAGLE SCREW CO.
[3 Story, 402;[1] 2 Robb, Pat. Cas. 268.]

Circuit Court, D. Rhode Island. June Term, 1844.

PATENTS—DAMAGES FOR INFRINGEMENT—ACT OF 1839—PURCHASER UNDER WRONG-DOER.

1. To entitle a person to claim the benefit of the 7th section of the patent act of 1839, c. 88 [5 Stat. 353], he must be a person, who is a purchaser, or who has used the patented invention before the patent was issued, by a license or grant, or by the consent of the inventor, and not be a purchaser under a mere wrong-doer.

[Cited in Allen v. Blunt, Case No. 217; Teese v. Phelps, Id. 13,819; Beach v. Tucker, Id. 1,153; Bates v. Coe, 98 U. S. 46; Kelleher v. Darling, Case No. 7,653; Brickill v. Mayor, etc., of New York, 7 Fed. 482; Wade v. Metcalf, 16 Fed. 132; Andrews v. Hovey, 124 U. S. 703, 713, 8 Sup. Ct. 678, 683.]

2. The case of McClurg v. Kingsland, 1 How. [42 U. S.] 202, commented on and explained.

3. In causes for violation of a patent, the jury are at liberty to give such reasonable damages as shall vindicate the rights of the patentee, and shall indemnify him for all expenditures necessarily accrued in the suit beyond what the taxable costs will repay.

[Cited in Allen v. Blunt, Case No. 217.]

[See Bancroft v. Acton, Case No. 833.]

This was an action of the case brought by the plaintiff [Jeremiah H. Pierson], as assignee of a patent "for an improvement in the machine for cutting the threads of wood and other screws," for an infringement of the patent. The patent under which the plaintiff claimed was taken out by one Henry Crum, as the inventor, and bore date November 14th, 1836 [No. 79]. The assignment was made by Crum to the plaintiff on the 20th of January, 1838. No question was made at the trial as to the substantial identity of the machines used by the Eagle Screw Company, with the improvement patented by Crum, which improvement consisted mainly in a feeding-wheel, called the wheel (D,) in Crum's specification; of a tambourine shape, which supplied, with regularity and precision, the blanks to the cutters or dies, for the purpose of cutting the threads of the screws.

At the trial, John P. Knowles and Richard W. Greene, for defendants, rested their defence mainly upon two grounds. First, they denied that Crum was the original and first inventor of the feeding-wheel of the machine, and claimed to use it under a patent taken out for a similar cutting machine, which embraced a feeding wheel substantially the

[1][Reported by William W. Story, Esq.]

same, which patent was taken out by one Clement O. Read, on December 15th, 1837, and had been by mesne assignment vested in them. The testimony, however, clearly proved, that Crum was prior in time in his invention as well as in his patent: and, indeed, the counsel for the defendant, upon the coming in of the proof at the trial, did not contend before the jury for the priority of Read's invention, but rather, in reference to the question of damages, that it was an independent invention of Read's prior to Crum's patent or application for a patent, though posterior in point of time to Crum's invention.

The second point of defence was, that the Eagle Screw Company had purchased a right to use a certain number of cutting machines, embracing the improvement in question, of the Providence Screw Company, as assignees of Read, an independent inventor, prior to Crum's application for his patent; and that, notwithstanding Crum was first inventor and patentee of the improvement, they had a right to use the machines actually in operation in their works, under and by virtue of the 7th section of the patent act of 1839, without accountability to Crum or his assignee. They cited the case of McClurg v. Kingsland, 1 How. [42 U. S.] 202, and insisted, that the opinion of the supreme court in that case, and, especially, that portion of it (pages 208, 209) in which they say, "The object of this provision (7th section of the act, 1839) is evidently two-fold. First, to protect the person who has used the thing patented, by having purchased, constructed, or made the machine, &c. to which the invention is applied, from any liability to the patentee or his assigns. Second, to protect the rights granted to the patentee against any infringement by any other person, &c."

Samuel Ames and Seth P. Staples, in behalf of the plaintiff contended, that the case cited was to be distinguished from the case at bar in this, that, in the case cited, the purchase of the machine or right was from the first inventor and only patentee, made, it is true, prior to his obtaining his patent, whereas in the case before the court, the purchase by the defendants was from one whose invention and patent were subsequent in point of time to the invention and patent of the plaintiff, and could vest no greater right than he had—and that the defence was therefore nothing more than the setting up a subsequent invention and patent against a prior invention and patent, which, if permitted to prevail, would operate as a virtual repeal of the patent law, and take away all protection from inventors. It was said, that the general language of the court in McClurg v. Kingsland [supra] was of course to be construed in reference to the facts before them.

They farther contended, that Crum's patent, under which the plaintiff claimed, was taken out in 1836, nearly three years prior to the passage of the act of 1839, and that rights

had vested under it prior to that act: and that, in the case of McClurg v. Kingsland the court say (page 206) that acts of congress "may be retrospective in their operation, and that is not a sound objection to their validity: the powers of congress to legislate upon the subject of patents is plenary by the terms of the constitution, and as there are no restraints in its exercise, there can be no limitation of their rights to modify them at their pleasure, so that they do not take away the rights of property in existing patents." In McClurg v. Kingsland the patent was destroyed by public use of the thing patented prior to the application for the patent, and could be sustained only by the help of the seventh section of the act of 1839, passed subsequently to the issuing of the patent. The same seventh section, which held up the patent in that case, killed the case itself; so that though retroacting, it could not be said in this case to take away the rights of property in existing patents.

STORY, Circuit Justice (summing up to the jury). I have already in the course of the discussion at the bar had occasion to express my opinion upon the second point made at the bar, as a matter of law; for there is no dispute as to the facts. I shall now, therefore, merely recapitulate it. For the defendants the argument is, that the Eagle Screw Company had a right to use the machines purchased by them from Read before Crum's patent was obtained, although Crum was the prior and true inventor and patentee under the 7th section of the patent act of 1839, c. 88; and great reliance is placed upon the case of McClurg v. Kingsland, 1 How. [42 U. S.] 202. In my opinion, neither the act of congress, nor the case of M'Clurg v. Kingsland, justifies such a doctrine. Supposing the argument to be well founded, what would be the legal result? Why, that a mere wrong-doer, who by fraud or artifice, or gross misconduct, had gotten knowledge of the patentee's invention before he could obtain his patent, without any laches on his part, could confer upon a purchaser under him—bonâ fide and without notice—a title to the patented machine, which he himself could not exercise or possess. Certainly there is no ground to say, that a person, who pirates the invention of any party prior in point of time and right, can make any valid claim thereto against the prior and true inventor. How, then, can he confer on others a title, which he himself does not possess? Upon general principles, the assignee can ordinarily claim no more than his assignor can lawfully grant. But it is said, that the 7th section of the act of 1839, c. 88, declares, "that every person or corporation, who has or shall have purchased or constructed any newly invented machine, manufacture, or composition of matter, prior to the application by the inventor or discoverer for a patent, shall be held to possess the right to use and vend to others to be used the specific

machine, manufacture or composition of matter, so made or purchased, without liability therefor to the inventor, or any other person interested in the invention; and no patent shall be held to be invalid by reason of such purchase, sale or use, prior to the application for a patent as aforesaid, except on proof of abandonment of such invention to the public, or that such purchase, sale or prior use has been for more than two years prior to such application for a patent." Certainly the language in the first clause of this section is very general, not to say loose, in its texture. But if it stood alone, a first interpretation of it might fairly lead to the conclusion, that the purchaser there spoken of was a purchaser, not from a mere wrong-doer, but from the first and true inventor, before he had obtained his patent. The language of the clause does not even include the qualification, that the purchaser should be a bonâ fide purchaser for a valuable consideration, without notice of the claim or title of the inventor, or of any fraud of the vendor upon that claim or title. Yet, surely, it could never have been the intention of this clause to confer on a fraudulent purchaser, or a purchaser with full notice, a right to use an invention pirated from the original inventor, by wrong. If, on the other hand, we interpret the language to mean a purchaser from the inventor himself, before his application for a patent, the omission of such qualifying words is at once material and consistent with the apparent objects of the section. But the remaining clauses of the section render this interpretation perfectly clear and right. These clauses point solely to the inventor, and demonstrate, that the purchaser before spoken of was a purchaser from the inventor himself. The language is, "and no patent shall be held to be invalid by reason of any such purchase, sale, or use prior to the application for a patent, as aforesaid, except on proof of an abandonment of such invention to the public." Now, the inventor, and the inventor alone, is competent to abandon his invention to the public, and no use by the public except with his knowledge and consent can be deemed an abandonment of his invention to the public. It is, therefore, put as an exception carved out of the preceding words; and if the purchase, sale, or prior use were from or under the inventor, and with his consent and knowledge, the exception would have its appropriate effect. It is an exception ejusdem generis. The clause would then read in legal effect thus—the patent shall not be held invalid by reason, that the inventor has sold or allowed his invention to be used prior to the application for a patent, unless he has abandoned it to the public. Then follows the remaining clause, "Or that such purchase, sale, or prior use, has been for more than two years prior to such application for a patent;" which also imports another exception, limiting the right to make application for a patent to the period of two years after the inventor has sold or allowed his invention to be used by others. Any other construction of these clauses would lead to this extraordinary conclusion, that the inventor would be deprived of the benefit of his invention and his right to a patent without any laches, or misconduct on his own part, by the mere acts of a wrong-doer without his knowledge or against his will; and the exceptions, in a practical sense, would become nullities. But construed, as we construe them, and they have a plain, appropriate, and satisfactory meaning. This view of the matter is in entire coincidence with the whole theory and enactments of all the other patent acts, and with the judicial interpretations, which have been constantly put upon them. It has been the uniform doctrine of the courts of the United States, that no fraudulent or wrongful use of an invention, and no public use without the consent or knowledge or sanction of the inventor, would deprive him of his right to a patent. See Pennock v. Dialogue, 2 Pet. [27 U. S.] 1; Grant v. Raymond, 6 Pet. [31 U. S.] 248, 249; Shaw v. Cooper, 7 Pet. [32 U. S.] 292; McClurg v. Kingsland, 1 How. [42 U. S.] 202, 207. See Act 3d July; 1832, c. 162, § 3 [4 Stat. 559]; Act 1836, c. 357, § 15 [5 Stat. 123].

The case of McClurg v. Kingsland, 1 How. [42 U. S.] 202, properly considered, contains nothing in conflict with this doctrine. The learned judge (Mr. Justice Baldwin) who delivered the opinion of the court, in commenting upon the 7th section of the act of 1839, said: "The object of this provision is evidently twofold; first, to protect the person, who used the thing patented by having purchased, constructed, or used the machine, &c. to which the invention is applied, from any liability to the patentee, or his assignee; second, to protect the rights granted to the patentee against any infringement by any other persons." This language is certainly general; but then, in order to understand it correctly, we must apply it to the very case then before the court; and in this view, it was perfectly accurate and appropriate. What was that case? It was a case, where the patentee, before he attained his patent, allowed the defendants to use for their own profit the very improvements invented by him; and indeed, the improvement was invented by the patentee, while he was in their employment and receiving wages from them, and he freely allowed them to use it. Afterwards, the assignee of the patentee brought the suit against the defendants for using the improvement after the patent was granted. The circuit court held, that the facts justified the jury in presuming, that the defendants used the improvement under a license or privilege originally granted to them by the inventor, and that the facts of the case brought it directly within the 7th section of the act of 1839. Mr. Justice Baldwin presided in the circuit court at the trial, and he also delivered the opinion in the supreme

court. So that, putting both opinions together on the points in controversy, it is plain, that the learned judge, by the language above stated, meant to affirm no more than that where the invention had, before the patent, been used under a license or grant of the patentee, that license or grant being a purchase, or sale, or use with the consent of the patentee, was within the provision of the 7th section of the patent act of 1839. It seems to us, that no reasonable objection exists to this doctrine; and it is in conformity to and in illustration of the very doctrine already stated by us as the true meaning of the section. Indeed, the context immediately following the passage here cited from the opinion of the learned judge shows this to have been his meaning. In the former part of the opinion he had endeavored to show, that, under the prior acts of congress, if the patentee allowed not merely the public use, but even a free individual use of his invention before he obtained a patent, that would deprive him of his right to a patent; and that the 7th section of the act of 1839 was intended to cure this inconvenience and defect in the law. "This," (section) says the learned judge, "relieved him (the patentee) from the effect of the former laws and their constructions by this court, &c. &c., while it puts the person who has had such prior use on the same footing, as if he had a special license from the inventor to use his invention; which, if given before the application for a patent, would justify the continued use after it issued without liability." So that here we have expressed in a pointed manner the true object and intent of the 7th section of the act of 1839, which was to give validity to the patent, and yet to secure to a purchaser from him before the patent, the same right to use the same after the patent which he previously possessed.

The other point of the defence is so completely met by the evidence, that it is unnecessary to comment on it. It seems to be admitted that the evidence is too strong in favor of the plaintiff, and against the defendant, to admit of any reasonable doubt; and accordingly the counsel for the defendants, considering the law upon the other point ruled against them, have confined themselves mainly in the closing argument to the question of damages. I shall leave the whole evidence for your consideration without remark. But upon the question of damages I would upon this occasion state (what I have often ruled before) that if the plaintiff has established the validity of his patent, and that the defendants have violated it, he is entitled to such reasonable damages as shall vindicate his right, and reimburse him for all such expenditures as have been necessarily incurred by him beyond what the taxable costs will repay, in order to establish that right. It might otherwise happen, that he would go out of court with a

verdict in his favor, and yet have received no compensation for the loss and wrong sustained by him. Indeed, he might be ruined by a succession of suits in each of which he might, notwithstanding, be the successful party, so far as the verdict and judgment should go. My understanding of the law is, that the jury are at liberty, in the exercise of a sound discretion, if they see fit (I do not say that they are positively and absolutely bound under all circumstances) to give the plaintiff such damages, not in their nature vindictive, as shall compensate the plaintiff fully for all his actual losses and injuries occasioned by the violation of the patent by the defendants.

Verdict for the plaintiff. $2,000.