**WINSLOW MANUFACTURING CO.,**
**Plaintiff,**

**v.**

**PEERLESS GAUGE CO., Herb Greene, d.b.a. Industrial Sales & Engineering Co., and Micro Design Service, Inc., Defendants.**

**Civ. A. No. 31944.**

United States District Court
N. D. Ohio, E. D.

June 11, 1958.

As Modified Nov. 17, 1958.

Albert L. Ely, Jr., Ely, Pearne & Gordon, Howard R. Hirsch, Cleveland, Ohio, for plaintiff.

John F. Oberlin, Portman & Portman, Cleveland, Ohio, for defendant.

McNAMEE, District Judge.

Plaintiff, Winslow Manufacturing Company, is an Ohio corporation and the owner by assignment from Leo Price, its president, of Patent No. 2709854 for "Gauge Mounting." The defendant, Peerless Gauge Company, is a Michigan corporation, with its principal place of business in Detroit, Michigan. The present corporate name of defendant, Micro Design Service, Inc., an Ohio corporation, is The Aeromotive Designers, Inc., and its principal office is in Cleveland, Ohio. The defendant, Greene, is also a resident of Cleveland.

Winslow brought suit against the defendants alleging infringement of Claims 3 and 6 of Patent No. 2709854 and also charged the defendants with engaging in unfair competition. In its original answer Peerless challenged this court's venue on the ground that it was a Michigan corporation and had no regular and established place of business within the jurisdiction of this court. However, on December 13, 1957 Peerless filed a counterclaim for declaratory judgment, praying that the Court declare the claims of the patent in suit to be invalid and that certain claims were not infringed. The filing of such counterclaim waives venue. The evidence is insufficient to establish the claim of unfair competition. Plaintiff contends, however, that defendants' failure to make discovery on this issue is sufficient warrant for reserving the issue of unfair competition for later determination in the event an accounting be ordered by the Court. The record shows that at the outset of this proceeding plaintiff complained of defendants' failure, at the time depositions were taken, to disclose facts bearing upon the issue of unfair competition. However, the Court afforded plaintiff an opportunity to make a full inquiry in respect of this issue at the time of trial and offered to grant such continuance as might be necessary to enable plaintiff fully to develop the facts relevant thereto. Plaintiff, however, submitted no evidence in support of this claim. I hold, therefore, that the claim of unfair competition ought to be and is hereby dismissed.

The defendants, Peerless and Greene, are charged as infringers of Claims 3 and 6 of the patent, and Aeromotive Designers, Inc. is charged with contributory infringement. The subject matter of the patent in suit is described as a

"Gauge Mounting" for guillotine gauges which are instruments used in measuring the complex and unsymmetrical curves of turbine parts of jet engines. Guillotine gauges are concededly old and many such gauges have long been in use. They operate on the principle of providing reciprocal curved knife edges that can be slid toward and away from the curved surface of the turbine blades being tested and are designed to measure such blades with minute precision and accuracy.

Plaintiff makes no claim of ownership of an invention of a guillotine gauge but it does claim title to the invention of an adjustable gauge mounting that substantially eliminates the need for building new sets of mountings whenever jet engine parts of different shapes and dimensions are to be measured. The numerous turbine parts of a jet engine are of various shapes and sizes. Each part must be measured with the utmost precision and accuracy. This is accomplished by the use of different guillotine blades and changes in the position of such blades. Prior to plaintiff's invention, reciprocal guillotine gauge blades were placed in box-like mountings securely fastened at the ends of a metal base with the heavy side members and top member of the structure serving as a frame for horizontal slides of the gauge blades. Whenever it became necessary to use gauge blades in different positions and of different sizes and contours, the gauge mounting had to be substantially rebuilt. This resulted in a slow and expensive performance of the work. These undesirable features were eliminated by the patented device. The invention provides a stack of alternate slotted guide blocks and unslotted spacer blocks at each end of a metal base with openings aligned with each other and corresponding openings in the base; closely fitted pins or tension members run through these openings to pull the blocks down on to the base. The effect of the pins and the tension is to unite the stacks of spacer blocks and guide blocks as a solid immobile mass of metal through which gauge blades can be slid with unvarying accuracy. The stacks of spacer blocks and guide blocks can be readily dissembled and the spacer blocks replaced with others of appropriate size. The gauge blocks are interchangeable and reusable. Thus provision is made by the invention for a mounting so constructed as to permit guillotine blades to be mounted thereon in a plurality of positions and arrangements as required for different articles with one base member as a foundation. The invention also permits many of the elements to be mass produced and held in inventory, thus reducing the cost of manufacture and increasing the speed of production.

The application for the patent was filed on August 18, 1954 and the patent issued on June 7, 1955. No references were cited against the patent, which covers six Claims, of which only Claims 3 and 6 are alleged to be infringed. The issues are: (1) Validity; (2) Infringement.

Claim No. 3 reads:

"3. The combination of a base member, an orienting device centrally carried on the base member for orienting an article to be gauged relative to a reference line passing vertically through said base member intermediate of its ends, support means carried by said base member adjacent its opposite ends and embracing said orienting device, each said support means comprising a plurality of guide blocks and spacer blocks alternately arranged and stacked vertically over said base member adjacent a said end, the stack of guide blocks and spacer blocks and said base member having aligned holes in registration with each other, vertically disposed pin members closely fitting in said aligned holes, and securing said blocks in fixed position on said base member relative to said reference line, each said guide block having a horizontally disposed slide-way formed therein for slidability re-

ceiving a guillotine gauge blade movable therein toward and away from said reference line, each guide block having a slide thereof disposed vertically and providing a reference plane for comparing the position of the blade carried by the guide blocks with said reference plane, said slides forming said reference planes of said support means being equidistant from said reference line."

Claim No. 6 is as follows:

"6. The combination of a base member, guide blocks and spacer blocks for mounting a plurality of guillotine gauge blades reciprocal in said guide blocks relative to an article to be gauged, said base member having a centrally located primary reference line vertically disposed and at right angles to the horizontal plane of the base member, means for securing an article orienting mechanism to said base member to orient an article relevant to said primary reference line, said base member having openings on opposite sides of, and disposed on secondary reference lines equidistant from, said primary reference line, said guide blocks and spacer blocks being stacked over said base member adjacent its opposite ends, said blocks having openings therethrough axially aligned with each other and with openings in said base member, said guide blocks each having a side disposed away from said primary reference line and positioned equidistantly from said secondary reference lines, said sides forming reference planes for comparison with the positions of said gauge blades in the guide blocks, said reference planes being equidistantly spaced from, and on opposite sides of, said primary reference line."

■ Defendants contend that Claim No. 6 is invalid on its face by reason of the omission therefrom of any reference to the "vertically disposed pin members closely fitting in said holes."

In opposition to this claim of defendants, plaintiff asserts that a complete and detailed description of the invention is set forth in the specifications and that under the third paragraph of Section 112 of the Patent Act, effective July 19, 1952, 35 U.S.C.A. § 112, it is unnecessary to include the omitted language in Claim No. 6. The third paragraph of Section 112 reads:

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. July 19, 1952, c. 950, § 1, 66 Stat. 798."

As noted in the Commentary on the new Patent Act, Title 35, Vol. 1, p. 25:

"It is unquestionable that some measure of greater liberality in the use of functional expressions in combination claims is authorized * * * but the exact limits of the enlargement remain to be determined."

In the Application of Lundberg, 244 F.2d 543, 547, 44 CCPA 909, the court said:

"This 'measure of greater liberality,' however, is subject to well defined limitations, for Congress did not intend, by incorporating the third paragraph into section 112, to destroy certain basic precepts of patent law * * * it is still true that 'the claim is the measure of the invention.' The requirement in the second paragraph of section 112 that 'the specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention' has not been at all diminished by the addition of the third paragraph; the latter paragraph must be read in the light of the first and second paragraphs and given an interpretation

consistent with their clear meaning."

In Claim No. 6 there is an omission of the element which is the heart of the invention. Reference to the "vertically disposed pin members" appears in each of the other five claims and in the specifications and it is clear that the "pins" which secure the blocks in a fixed position on the base member are an indispensable element of the invention. Absent the "vertically disposed pin members" there is no patentable device. A deficient claim cannot be aided by reading into it parts of other claims or of the specifications. Altoona Publix Theaters v. American Tri-Ergon Corp. et al., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005. See also Milcor Steel Co. v. Fuller, 316 U.S. 143, 62 S.Ct. 969, 86 L.Ed. 1332. The cases cited by plaintiff do not hold otherwise. In Deering v. Winona Harvester Works, 155 U.S. 286, 302, 15 S.Ct. 118, 39 L.Ed. 153, the court held in effect that in order to validate the claim it was unnecessary to read into it the precise elements described in the specifications as rendering the invention operative. Here it is necessary to read into Claim No. 6 the omitted element of the "pins" in order to validate the claim. Addressograph-Multigraph Corp. v. Staudt, 2 Cir., 124 F.2d 672, 675, relied on by plaintiff, is also distinguishable. There the court held that the omission in the claim of an element included in the specifications did not necessarily render the claim invalid. The court expressed the view that notwithstanding the omission "the claims in suit may cover a disclosed invention." In Doble Eng. Co. v. Leeds & Northrop Co., 1 Cir., 134 F.2d 78, 85, also cited by plaintiff, the court merely followed the principle of Deering v. Winona Harvester Works, supra. On the other hand, the United States Court of Customs and Patent Appeals has consistently held that the particular feature or fact upon which an applicant predicates patentability must not only be disclosed in the specification but also be recited in the claims. Application of Rose, 220 F.2d 459, 464, 42 CCPA 817; Application of Richards, 187 F.2d 643, 645, 33 CCPA 900; In re Lane, 168 F.2d 551, 35 CCPA 1217 and In re Henschell, Cust. & Pat. App., 90 F.2d 357. There can be no doubt that the pin members of the patented gauge are of paramount importance. They are the means by which the requisite stability and adjustability of the gauge mounting is achieved. Plaintiff argues that Section 112 specifically permits a patentee to omit from his claims specific structural details shown in the specification. However, this is true only where "an element in the claim for a combination" is "expressed as a means or a step for performing a specified function." (Sec. 112) The element of "vertically disposed pin members" is not mentioned at all in Claim No. 6, to say nothing of its being expressed as a means or step for performing a specified function.

I hold that Claim No. 6 is deficient in the respect indicated and is invalid.

■■■ Defendant contends that both Claims 3 and 6 are invalid because so-called guillotine gauges operating on the same general principle as the gauge disclosed in the patent were known and had been made and used in this country specifically by Thompson Products Company of Cleveland, Ohio more than one year prior to August 18, 1954 when the application for the patent in suit was filed and in any event prior to any date that the patentee, Price, has established as the date of the completion of his alleged invention. In support of the claim of prior public use more than one year prior to August 18, 1954, defendant offered in evidence 31 sheets of drawings of the Thompson Universal guillotine gauge B.G. 7384A which were prepared by Aeromotive Designers, Inc. on orders from Thompson and from Micro Machine Tool Company, the manufacturer of gauges for Thompson. The evidence shows that sheets 2–3–5–8–9–11 of these drawings were completed on August 11, 1953 and sheets 4–7 were completed late in July of 1953. However, sheet No. 6 was not a completed drawing until No-

vember 30, 1953 and sheet No. 10 was not completed until December 5, 1953. It is extremely doubtful if gauges represented by these drawings could have been manufactured prior to August 18, 1953 and certainly no gauge could have been manufactured before that time from drawings that were not completed until after that date. The remaining drawings of Exhibit F, comprising sheets 12 to 31 as well as sheets Nos. 6 and 10 mentioned above, were all completed after August 18, 1953. The completion dates as shown on the sheets ranged from September 5, 1953 to July 28, 1954. Defendants have not sustained the burden of proving beyond a reasonable doubt that gauges represented by these drawings were in public use or on sale in this country more than one year prior to the date of Price's application for the patent. Price testified that he conceived the patented structure in 1952 and that beginning in February 1953 he assigned Clark, one of the employees of the Winslow Manufacturing Company, to work from time to time on the development of the new gauge. The date when the gauge was reduced to practice is not clearly established as being prior to May 25, 1954 when Price exhibited a model of the patented gauge to Thompson Products. Following the demonstration of the model an operative patented gauge was sold to Thompson by Winslow in June 1954. Defendants contend that the Thompson Universal guillotine gauge No. BG 7384A was in public use before the above demonstration and sale of the patented gauge to Thompson. Proof as to such public use consists of the oral testimony of Barron, president of Aeromotive Designers, Inc., and three invoices of Micro Machine Tool Company dated January 29, January 30 and February 5, 1954 indicating delivery to Thompson of one BG 7384A guillotine gauge on each of the above dates. However, this is not sufficient to show a prior public use of the invention. The Thompson gauge had no aligned holes in the stacks of guide blocks and spacer blocks nor did it have any closely fitting pins running through the holes to mount the blocks on the base. The Thompson gauge was not the same as the Price invention. It was not an invention at all, being merely a variant of the old style box gauge. Since the Thompson gauge is not the Price invention, the testimony and exhibits relating to the alleged prior use of the Thompson gauge can have no effect on the patentability of the Winslow gauge. As was said in Goodwin v. Borg-Warner, 6 Cir., 157 F.2d 267, 272:

> "The public use which invalidates an invention under § 31, 35 U.S.C., 35 U.S.C.A. § 31, is a public use of the very invention patented. American Hide & Leather Splitting & Dressing Mach. Co. v. American Tool & Mach. Co., C.C.Mass., 1 Fed.Cas. p. 647, No. 302; Draper v. Wattles, C.C.Mass., 7 Fed.Cas. p. 1061, No. 4073. Cf. Andrews v. Hovey, 124 U.S. 694, 712, 8 S.Ct. 676, 31 L.Ed. 557; Campbell v. Mayor of New York, C.C.N.Y., 47 F. 515."

Dowless v. Hooks, 125 F.Supp. 96, 99 is to the same effect. See also Bourne v. Jones, D.C., 114 F.Supp. 413, aff. 5 Cir., 207 F.2d 173, wherein the court said:

> To constitute public use to bar a patent the use must have been of the perfected invention.

■■■■ Whether there has been such a public use as to invalidate a patent is a question of fact. I find no such prior public use of the invention has been shown by the evidence in this case.

Defendants contend also that the patented gauge is an improvement that is a result of mere mechanical skill. This argument rests in substantial part upon evidence showing that two months before Price demonstrated the patented device to Thompson, the Designing Department of Winslow Manufacturing Company received copies of some of the drawings in Exhibit F. It is suggested that all that Price did was to standardize parts of the Thompson gauge from the knowledge gained from the drawings of Exhibit F and develop manufacturing techniques for quantity production of such parts. However, the evidence clearly demon-

strates that Price did much more than this. He conceived and perfected a gauge mounting that secured results not possible of attainment by the use of the Thompson gauge mounting or other old style gauge mountings. The fact that the invention may have been perfected two months after the Winslow Manufacturing Company had some of the drawings of Exhibit F in its possession is of no probative value on the question whether the patented structure was invention or the result of mechanical skill. Apart from the substantial difference between the invention and the Thompson gauge it is clear that Price conceived the invention in 1952 and that long before March 1954 he and his employee, Clark, were engaged in the development work necessary to complete and perfect the patented gauge. The invention is a combination of old elements. In the bright light of retrospection it may appear that the means adopted by Price were simple and such as should have been obvious to mechanics familiar with the art. But under the evidence "this is not enough to negative invention." Goodyear Tire and Rubber Co. v. Ray-O-Vac, 321 U.S. 275, 279, 64 S.Ct. 593, 594, 88 L.Ed. 721. In Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523, Chief Justice Taft said:

> "In the case before us, for the reasons we have already reviewed, we think that Eibel made a very useful discovery which has substantially advanced the art. His was not a pioneer patent, creating a new art; but a patent which is only an improvement on an old machine may be very meritorious and entitled to liberal treatment."

There can be no doubt that the Winslow gauge substantially advanced the art. Prior to its advent the testing and measuring of turbine blades and buckets of jet engines was a slow and costly operation. The evidence shows that the number of blades or buckets in a jet engine frequently exceeds 1,000 and that two-thirds of the cost of the blades is represented by the expense of inspection. There was, therefore, a long felt need of accomplishing the important and delicate task of measuring these multitudinous parts with greater speed and at less expense and it was important that the saving of time and money be achieved without any loss of efficiency in the accurate measurement of the parts. Price's invention was a notable advance in that it accomplished these greatly needed and highly meritorious results. The patented gauge has been accepted by 90% of the industry. Large corporations, such as The Ford Company, Thompson Products, Ex-Cello Corporation, The Lycoming Division of Avco Manufacturing Corporation and others, have standardized their gauging operations by the use of the invention. It may be said here, as was said in Cugley v. Bundy Incubator Co., 93 F.2d 932 (6th Cir.):

> "While the component elements of the method are old, it achieves such new and highly meritorious results that we conclude that it rises to the dignity of invention."

Defendants' reliance upon Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, is inconsistent with the claims made by Powers, president of Peerless Gauge, in his application for a patent on the accused device. On May 9, 1955, shortly before the patent in suit issued, Powers applied for patent on the accused device which performs the same functions and operates on the same principle as the Winslow gauge. The claims of Powers and the arguments of his counsel before the Patent Office effectively negate the contention now made by defendants that the patented gauge "adds nothing to the total stock of knowledge." The Winslow gauge rendered all previous types of gauges substantially obsolete. Its ready acceptance and enthusiastic endorsement by manufacturers of jet engines and manufacturers of jet engine parts is convincing evidence that the Winslow gauge added to the sum of useful knowledge.

Prior to the Price invention the only known methods of gauging the blades of jet engines of different sizes and contours

was the costly and slow process of rebuilding substantially new mountings. The need for a speedier and less expensive method of gauging had long been apparent. These facts were known to the skilled mechanics and highly trained engineers connected with the jet engine industry. Yet apparently Price's conception never occurred to any of them prior to the time of the completion of the patented gauge.

■ The statutory presumption of the validity of Claim No. 3 of the patent is strengthened rather than weakened by the evidence. It is strengthened by the novelty and utility of the patented structure. The invention filled a long felt need; it was immediately accepted by the industry and has met with great commercial success. These are factors entitled to weight in determining whether the improvement amounted to invention and should in a close case tip the scales in favor of patentability. Goodyear Tire and Rubber Co. v. Ray-O-Vac, supra. See also Harris, d. b. a. Harris Products v. National Machine Works, Inc., 10 Cir., 171 F.2d 85.

I hold that the Winslow gauge was not anticipated by the Thompson gauge; that the Winslow gauge is an invention and that Claim No. 3 of the patent in suit is valid.

## INFRINGEMENT

In view of the determination hereinabove made that Claim No. 6 of the patent is deficient and invalid, it is unnecessary to determine whether that claim of the patent has been infringed.

There is no dispute as to the manufacture and sale by defendant, Peerless, of gauges of the construction exemplified by the accused device. There remains the question whether such construction infringes Claim 3.

Basically Claim No. 3 provides for a metal base, a stack of spacer and guide blocks mounted on such base adjacent to the respective ends thereof, a mounting for the article to be gauged midway between such stacks and a plurality of reciprocal guillotine blades slidably mounted in the guide blocks of each stack so as to be movable toward and away from the article to be measured. The stacks of spacer and guide blocks have aligned holes in registration with each other in which are placed closely fitting pin members that secure the blocks in fixed position on the base member relative to the primary reference line midway between the stacks. Threaded bolts engaging washers co-operate with the pin members to tightly secure the stacked blocks together and to the base member. (Spec. Col. 3, 11. 66 et seq.)

The vertically disposed sides of the guide blocks which are equidistant from the primary reference line constitute reference planes for comparing the position of the gauge blades in the guide blocks. The end surfaces of the gauge blades are compared with the reference plane provided by the side surfaces of the guide blocks through the sense of feeling in the fingers of the operator or through sight in comparing the position of these end surfaces relative to the vertical reference plane. In place of trusting to the sense of feeling or sight, a conventional type of gauge may be employed to determine whether or not such end surfaces are aligned with the reference plane thus provided. The last two clauses of Claim 3 (and equally so the corresponding clauses of Claim 6) are limited to the provision of the reference plane in question by the sides of the guide blocks.

Thus the patented combination secures the requisite stability for accurate measurement of turbine parts and provides adequate means for testing the accuracy of such measurements. In addition, whenever it becomes necessary to use guillotine blades of different shapes and sizes the necessary adjustments can be made by the simple expedient of removing the blocks and blades in use and replacing them with members of appropriate sizes and shapes. Defendant contends that the accused structure avoids infringement on two grounds, (1) that the accused device has no closely fitting pins in the stacks of spacer and guide blocks, and (2) that the guide blocks of the accused device have no vertically dis-

posed sides providing reference planes for comparing the positions of the blades in the guide blocks.

(1) In the patented device the closely fitting pins or dowels, as stated above, secure the blocks in fixed position on the base member relative to the primary reference line and threaded bolts engaging washers co-operate with said pins to tightly secure the stacked blocks together and to the base member. In defendant's structure the pins which hold the stacks on the base are not closely fitting. Defendant's structure has a vertical column along one side of the stack to which the component blocks are secured or clamped and thus held in precise lateral alignment. However, neither such loose fitting pins nor side column serve to align the blocks in a longitudinal direction. Accordingly, it is unnecessary in defendant's construction to observe any close tolerance either (a) in the location of the pins, or (b) of the holes in the blocks, which such pins engage, or (c) in the distance between such holes and the outer side or end face of the blocks, inasmuch as such outer ends or faces of the blocks are not utilized to provide a reference plane for comparing the position of the blades carried by the blocks.

(2) Instead of utilizing the outer ends or faces of the guide blocks to provide a reference plane for comparing the position of the blades carried thereby, defendant's structure utilizes vertical rails or gauge posts erected beyond each stack of guide and spacer blocks to provide the plane in question. Use of these posts eliminates the necessity of insuring the exact location of the end faces or surfaces of the guide blocks as a reference plane, thus making it unnecessary to ensure the precise dimensioning and exact location of said blocks on the base, as is required in the patented device. Furthermore, in defendant's structure the blades are of such length that it would be impossible in use to move them toward the primary reference line far enough to bring their outer ends in alignment with the end faces or surfaces of the guide blocks, thus precluding the use

of such faces to provide the secondary reference plane.

Price did not invent a guillotine gauge. As shown by the record, many types of such gauges were in use before his invention. The patented structure is a combination of old elements and it seems clear that Claim No. 3 was expressly limited to avoid the prior art. The essence of Price's invention is in the precise means by which stability of the blocks and flexibility in measuring different sized blades is secured. The means adopted to secure these results are the close fitting pin members. Defendant's structure has not appropriated such means nor has it similarly positioned the means employed by it to secure such results. American Seating Co. v. Ideal Seating Co., 6 Cir., 124 F.2d 70, 72, 73. It appears that in the patented device the outer sides of the guide blocks which function as reference planes pertain to the inventive step. The stability of the blocks in that device makes possible the use of their vertically disposed sides as reference planes by locating such sides in precise alignment to the primary reference line. The stability of the blocks enables the operator of the patented device to make accurate measurements and by reference to the outer sides of the blocks to determine whether such measurements are accurate within the allowable tolerance. The latter function is no less important than the former. That the patentee regarded it as important to place the reference planes at the outer sides of the guide blocks is evident from the precise and exact language of Claim No. 3 limiting this element of the claim.

The accused device obtains the same results but by a different combination. As said in Lunati v. Barrett, 104 F.2d 313, 316 (6th Cir.):

"If the defendant does not have this combination he does not infringe."

The Lunati case lays down the principle that governs here, as follows:

"The claims in suit must be narrowly construed within the principle

**940**

so often applied in this court that where claims define an element in terms of form, location, or function, thereby creating an express limitation, where that limitation pertains to the inventive step and imports a substantial function which the patentee considered of importance, the court cannot be permitted to say that other forms which the inventor thus declared not equivalent are so to be treated. D'Arcy Spring Co. v. Marshall Ventilated Mattress Co., 6 Cir., 259 F. 236, 240; Hollingshead Company v. Bassick Mfg. Co., 6 Cir., 73 F.2d 543, 548; Directoplate Corp. v. Donaldson Lithographing Co., 6 Cir., 51 F.2d 199, and our recent decision in Valjean v. Perfection Stove Co., 6 Cir., 103 F.2d 60. *Whether our conclusion be based upon estoppel in patent office proceedings or upon a limitation voluntarily inserted in the claims to avoid prior art seems to us unimportant. The result in claim construction is the same.*" (Emphasis supplied)

█ For the reasons stated above it is held that the accused structure does not infringe the patented device. Accordingly plaintiff's prayer for an injunction and an accounting is denied and the complaint is dismissed against defendant Peerless Gage. The evidence does not show that defendant Aeromotive Designers, Inc. has contributed to or induced infringement. Said defendant is entitled to a dismissal. Nor can I find that the evidence is sufficient to establish that defendant Greene directly infringed the patent in suit and Greene is also entitled to a dismissal. The counterclaim of defendant Peerless Gauge will be dismissed except as to Claim No. 6 of the patent which, for the reasons stated, is held to be invalid. Claim No. 3 is held valid but not infringed.

An order may be prepared in accordance with the foregoing, which constitutes Findings of Fact and Conclusions of Law under Fed.Rules Civ.Proc. Rule 52(a), 28 U.S.C.A.